1
2
3
4
5
6
7
8
9
10
11
12
13

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CITY OF TACOMA,

Plaintiff,

v.

WESTERN METAL INDUSTRY
PENSION FUND and its BOARD OF
TRUSTEES,

Defendants.

CASE NO. 2:24-cv-99

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT

14

## 1. INTRODUCTION

15

16

17

18

19

20

21

22

23

An employer who withdraws from an underfunded multiemployer pension

plan must pay its fair share of the plan's unfunded liabilities. Congress established

this "withdrawal liability" as a fixed debt owed to the pension plan when it passed

the Multiemployer Pension Plan Amendments Act of 1980. *See Pension Ben. Guar.*

*Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 724–5 (1984); 29 U.S.C. §§ 1381, 1391.

This case arises from an arbitration award concerning Plaintiff City of

Tacoma's ("the City") withdrawal liability to Defendant Western Metal Industry

Pension Fund ("the Plan"). An arbitrator has already ruled that the Plan

improperly calculated the City's liability by using interest rates that didn't reflect the Plan's actual investment experience. The parties now seek judicial review of that arbitration decision.

At issue is whether the Plan's actuary made appropriate assumptions when calculating the City's withdrawal liability. ERISA requires plan actuaries to use reasonable assumptions that "tak[e] into account the experience of the plan and reasonable expectations" of investment returns and "offer the actuary's best estimate of anticipated experience under the plan[.]" 29 U.S.C. § 1393(a)(1). The Plan's actuary, however, did not base her interest-rate assumptions on the Plan's actual or expected investment returns of 7%. Instead, she used significantly lower "settlement rates" prescribed by the Pension Benefit Guaranty Corporation ("PBGC") for terminating plans—between 2.53% and 2.84%—ratcheting up the City's assessed liability by about $30 million.

Having reviewed the record, the parties' briefing, and the law, the Court, being fully informed, GRANTS the City's motion to enforce the arbitrator's award, Dkt. No. 17, DENIES the Plan's motion to vacate, Dkt. No. 18, and confirms the arbitrator's order requiring the Plan to recalculate the City's withdrawal liability using a 7% interest-rate assumption. Binding Ninth Circuit precedent clearly prohibits plans from using PBGC settlement rates that ignore the plan's actual investment experience. The arbitrator correctly applied this law to the undisputed facts.

1

## 2.  BACKGROUND

2

**2.1    Legal background.**

3

Congress enacted the Employee Retirement Income Security Act of 1974

4

(ERISA) "to provide comprehensive regulation for private pension plans." *Connolly*

5

*v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 213 (1986). ERISA aims "to ensure that

6

employees and their beneficiaries would not be deprived of anticipated retirement

7

benefits by the termination of pension plans before sufficient funds have been

8

accumulated in the plans." *Gray*, 467 U.S. at 720 (citing *Nachman Corp. v. Pension*

9

*Ben. Guar. Corp.*, 446 U.S. 359, 361–362 (1980)). To achieve this goal, Congress

10

"created the Pension Benefit Guaranty Corporation (PBGC), a wholly owned

11

Government corporation, to administer an insurance program for participants in …

12

pension plans." *Connolly*, 475 U.S. at 214; *see* 29 U.S.C. § 1302.

13

To address financial instability in multiemployer pension plans, Congress

14

later passed the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA),

15

which requires employers who withdraw from such plans to pay "withdrawal

16

liability"—their "proportionate share of the plan's unfunded vested benefits." *Gray*,

17

467 U.S. at 717, 725; 29 U.S.C. §§ 1381, 1391.

18

Central to this case is how withdrawal liability is calculated. When an

19

employer withdraws, the plan's actuary determines the liability amount by applying

20

various "actuarial assumptions," with the interest-rate assumption being "arguably

21

the most important." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers*

22

*Pension Tr. for S. Cal.*, 508 U.S. 602, 633 (1993). A higher interest rate yields

23

1    higher projected growth, reducing the liability assessment; a lower rate increases

2    the liability assessment. *GCIU-Emp. Ret. Fund v. MNG Enters., Inc.*, 51 F.4th 1092,

3    1099 (9th Cir. 2022).

4         ERISA requires that these actuarial assumptions be "reasonable (taking into

5    account the experience of the plan and reasonable expectations)" and, "in

6    combination, offer the actuary's best estimate of anticipated experience under the

7    plan[.]" 29 U.S.C. § 1393(a)(1). Alternatively, the statute also permits the use of

8    actuarial assumptions derived from PBGC regulations (*see* 29 U.S.C. § 1393(a)(2)),

9    but because no such final regulations have been issued, plans must currently use

10   the first method. *See GCIU*, 51 F.4th at 1098 n.2.

11        Importantly, the legal framework for individual employer withdrawals differs

12   from that governing mass withdrawals when all employers exit and the plan is

13   terminated. In mass-withdrawal situations, plans must typically purchase

14   annuities to cover benefits, and PBGC prescribes settlement rates reflecting risk-

15   free annuity prices rather than expected investment returns. *See Sofco Erectors,*

16   *Inc. v. Trs. of Ohio Operating Eng'rs Pension Fund*, 15 F.4th 407, 420–21 (6th Cir.

17   2021).

18        The MPPAA also establishes procedures for employers to challenge

19   withdrawal-liability assessments. Once the plan determines the liability amount, it

20   issues a notification and demand to the employer. 29 U.S.C. § 1399(b). If the

21   employer objects, the matter proceeds to mandatory arbitration. 29 U.S.C. §

22   1401(a)(1). During arbitration, the plan's calculations are presumed correct unless

23   the employer shows by a preponderance of evidence that "the actuarial assumptions

1    and methods used in the determination were, in the aggregate, unreasonable" or

2    "the plan's actuary made a significant error." 29 U.S.C. § 1401(a)(3)(B). After

3    arbitration concludes, either party may seek "judicial review of the arbitrator's

4    decision" in federal district court "to enforce, vacate, or modify the [arbitration]

5    award." *Concrete Pipe*, 508 U.S. at 611 (citing 29 U.S.C. § 1401(b)(2)).

6    **2.2    Factual background.**

7            The following uncontested facts support this Court's decision. *See* Dkt. No. 14

8    (*City of Tacoma, Claimant, v. Western Metal Industry Pension Fund, Respondent*,

9    AAA Case No. 01-23-0001-6879).

10           The Plan is a multiemployer pension plan under ERISA § 4001(a)(3), 29

11   U.S.C. § 1301(a)(3), maintained and administered through its Board of Trustees.

12   Dkt. No. 1 ¶ 3; Dkt. No. 6 ¶ 3. The City is a municipal corporation and qualifies as

13   an "employer" under ERISA §§ 3(5) and 3(14), 29 U.S.C. §§ 1002(5) and 1002(14)(C).

14   Dkt. No. 1 ¶ 2; Dkt. No. 6 ¶ 2.

15            Before 2019, the City contributed to the Plan under collective bargaining

16   agreements with five employee units. Dkt. No. 1 ¶ 13; Dkt. No. 6 ¶ 10. In 2019, the

17   City partially withdrew from the Plan when its obligation to contribute on behalf of

18   two of these bargaining units ceased ("Partial Withdrawal"). Dkt. No. 14-1 at 52;

19   Dkt. No. 6 ¶ 10. In 2020, the City completely withdrew when its obligation to

20

21

22

23

contribute on behalf of the remaining bargaining units ceased ("Complete Withdrawal"). Dkt. No. 14-2 at 274; Dkt. No. 6 ¶ 10.[1]

In November 2021, the Plan issued a demand letter to the City for $44,325,881 in withdrawal liability. Dkt. No. 14-2 at 277. This amount combined assessments for both the Partial Withdrawal and the Complete Withdrawal. For the Partial Withdrawal, the Plan's actuary used an interest-rate assumption of 2.84% for the first twenty years and 2.76% thereafter. For the Complete Withdrawal, the actuary applied an interest-rate assumption of 2.53% in perpetuity. *See* Dkt. No. 14-1 at 492 (2019 actuarial report), 558 (2020 actuarial report).

The Plan's actuary chose these interest-rate assumptions "based on the rates prescribed by the PBGC" for mass withdrawals under ERISA § 4044. *See* Dkt. No. 14-2 at 290; *see also supra* § 2.1. The Plan's annual actuarial valuation reports for 2019 and 2020 explained the reasoning behind this choice:

> Withdrawal liability is used to allocate a portion of Unfunded Vested Benefits to employers who withdraw from the fund. A withdrawal is viewed as a settlement similar to an annuity purchase where the transfer of investment risk for a portion of a plan's liabilities is assumed by an insurance company. Use of the PBGC rates reflects the fact that a withdrawn employer transfers investment risk to the remaining employers. As such, it is reasonable to use PBGC interest rates that are used to measure plan termination liabilities and which are considered comparable to rates used by insurance companies for annuities to measure the financial obligation of the withdrawing employer. In our professional judgement, the selected investment return assumption for

---

[1] In arbitration, the parties disputed the effective dates of the City's withdrawals. *See* Dkt. No. 14-1 at 30–42. The arbitrator did not reach those issues, *see* Dkt. No. 14-2 at 750–51, and they are not before the Court. The City "accepted [the Plan's withdrawal-date contentions] for purposes of the [sic] challenging the interest rate assumption, but reserved the right to raise an alternative argument if the interest rate argument was unsuccessful." Dkt. No. 1 ¶ 14.

1

2

> withdrawal liability is reasonable for this purpose and is not expected to
> have any significant bias.

Dkt. No. 14-1 at 492 (2019 report); *id.* at 558 (2020 report with identical language).

In her deposition, the Plan's actuary admitted that the PBGC settlement rates do

not reflect the Plan's actual or anticipated experience, but maintained that use of

the settlement rates was appropriate because "the employer is essentially settling

their obligation to the Trust." *See* Dkt. No. 14-2 at 367.

Crucially, the Plan used a completely different interest rate—7%—when

calculating minimum-funding requirements for contributing employers. The Plan's

2019 and 2020 actuarial reports explained this rate as follows:

> The investment return assumption [of 7%] was selected based on the
> Plan's target asset allocation as of the valuation date and capital market
> assumptions from several sources, including published studies
> summarizing the expectations of various investment experts. This
> information was used to develop forward-looking long-term expected
> returns, producing a range of reasonable expectations according to
> industry experts. Based on the resulting range of potential assumptions,
> in our professional judgment the selected investment return assumption
> is reasonable and is not expected to have any significant bias.

*Id.* at 558; *id.* at 492 (2019 report with identical language).

The Plan's actuary admitted during her deposition that this seven-percent

funding assumption, unlike the PBGC rates, reflected the expected returns of the

assets of the Plan "based on the current portfolio of the [P]lan, all the things it's

invested in, [and] the capital market assumptions or the forward-looking expected

returns of that portfolio based on a variety of publicly available information." *Id.* at

429.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

The City challenged the Plan's withdrawal-liability calculations through arbitration. *See generally* Dkt. No. 14 (Administrative Record of Arbitration). Both parties moved for summary judgment, with the City requesting recalculation using the 7% rate instead of the PBGC rates. *See* Dkt. No. 14-1 at 42. On January 2, 2024, Arbitrator Scogland ruled for the City, finding that "using an interest rate based on the settlement rate, as was done here, does not reflect the experience of the plan and is, therefore, impermissible." Dkt. No. 14-2 at 750–51. He ordered "[the Plan] and its actuary [to] reassess the withdrawal liability at the interest rate of 7% and give credit for payments previously made." *Id.*

In January 2024, the City sued to enforce the arbitration decision, and the Plan countersued to vacate it. Both parties now move for summary judgment. Dkt. Nos. 17, 18.

## 3.  DISCUSSION

### 3.1  Legal standard.

District courts play a limited role when reviewing arbitration decisions under the MPPAA. The arbitrator's factual findings enjoy a strong presumption of correctness, "rebuttable only by a clear preponderance of the evidence[.]" 29 U.S.C. § 1401(c). "The arbitrator's conclusions of law are reviewed de novo." *Penn Cent. Corp. v. W. Conf. of Teamsters Pension Tr. Fund*, 75 F.3d 529, 533 (9th Cir. 1996).

As always, summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party," and a fact is

1    material if it "might affect the outcome of the suit under the governing law."

2    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a

3    summary judgment motion, courts must view the evidence "in the light most

4    favorable to the non-moving party." *Barnes v. Chase Home Fin., LLC*, 934 F.3d 901,

5    906 (9th Cir. 2019) (internal citation omitted). "[S]ummary judgment should be

6    granted where the nonmoving party fails to offer evidence from which a reasonable

7    jury could return a verdict in its favor." *Triton Energy Corp. v. Square D Co.*, 68

8    F.3d 1216, 1221 (9th Cir. 1995).

9

10   **3.2    The arbitrator correctly found that the Plan's interest-rate
           assumption did not reflect the anticipated experience of the Plan
           and was therefore impermissible as a matter of law.**

11

12       The uncontested facts show that the Plan based the City's withdrawal-

13   liability assessment on an interest-rate assumption derived from the settlement

14   rates prescribed by the PBGC for mass withdrawals under ERISA § 4044—not from

15   the actual or expected experience of the Plan's asset portfolio. Arbitrator Scogland

16   found this interest-rate assumption impermissible as a matter of law. Reviewing

17   this legal conclusion de novo, the Court agrees.

18       Binding Ninth Circuit precedent directly addresses this issue. In *GCIU v.*

19   *MNG Enterprises, Inc.*, the Ninth Circuit confronted remarkably similar facts: a

20   multiemployer pension plan actuary calculated a departing employer's withdrawal

21   liability using the PBGC-prescribed settlement rate as the interest-rate

22   assumption; the employer disputed the assessment and compelled arbitration; and

23   the arbitrator found that the employer "had shown that the actuary relied on

1

2   unreasonable assumptions in deciding the interest rate for the withdrawal liability

3   because the PBGC rate disregarded the experience of the plan and the expected

4   returns on assets." *GCIU*, 51 F.4th at 1096. The district court agreed with the

5   arbitrator, and the pension plan appealed to the Ninth Circuit, which affirmed the

6   district court. *Id.* at 1099.

7       The Ninth Circuit held that "the actuary's use of the PBGC rate—without

8   considering the 'experience of the plan and reasonable expectations'—did not satisfy

9   the 'best estimate' standard." *Id.* (quoting 29 U.S.C. § 1393(a)(1)).[2] While

10  acknowledging that ERISA's reasonableness standard "build[s] in some leeway" for

11  actuarial judgment, the Ninth Circuit found that "[b]y ignoring the expected returns

12  of the plan's assets and experience, the actuary's estimate fell short of the statutory

13  'best estimate' standard because it was not tailored to the features of the plan." *Id.*

14  (quoting 29 U.S.C. § 1393(a)(1)). The Ninth Circuit "follow[ed] [its] sister circuits

15  and interpret[ed] the statute to require that the actuary's assumptions and methods

16  reflect the plan's characteristics." *Id.* (citing *United Mine Workers of Am. 1974*

17  *Pension Plan v. Energy W. Mining Co.*, 39 F.4th 730, 738 (D.C. Cir. 2022); *Sofco*, 15

18  F.4th at 419).

19      This case is virtually identical to *GCIU*. The Plan's actuary testified in her

20  deposition that she used the PBGC settlement rate to shift investment risk to the

21  _____

22  [2] In so holding, the Ninth Circuit "express[ed] no view on an actuary's use of the
    PBGC rate as a starting point or a component in a blended rate." GCIU, 51 F.4th at
23  1099 n.4; *cf. Sofco*, 15 F.4th at 420–21 (holding that plan actuaries may not use "a
    weighted blend of the interest rate used for minimum-funding purposes and
    annuity rates published by the PBGC"). This case does not present the question of
    the permissibility of a blended rate.

1

2

City because "the employer is essentially settling their obligation to the Trust." Dkt. No. 14-2 at 367. This is precisely the approach the Ninth Circuit rejected in *GCIU*.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

The Plan nevertheless advances a very narrow reading of *GCIU,* arguing that an exception should apply for "a multiemployer pension plan who has demonstrated that they cannot meet minimum contributions necessary to backstop the risk or volatility contemplated as certain in the ERISA minimum funding calculation (i.e. have a negative credit balance)[.]" Dkt. No. 18 at 19. The Plan suggests that such an exception might apply only to "multiemployer plans in *critical status (or the smaller subset who have already reached all reasonable measures*)." *Id.* (emphasis original). The Plan notes that it "has been in critical status since 2009 and has a credit balance deficiency because contributions are inadequate to meet the ERISA minimum funding calculation." *Id.* at 32 n. 21 ("It's in critical status for a reason – it's [sic] industry is fading, it's cashflow negative, and the Plan is reliant on volatile investment returns to fund benefits."); *see also* Dkt. No. 14-2 at 177 (Notice of Critical Status) ("The Plan is critical because the minimum contribution credit balance is projected to be exhausted within the three years following the current year.").

18

19

20

21

22

23

This argument is unpersuasive. First, there is simply no evidence that the Plan intends to terminate, liquidate its investment portfolio, and channel its assets into risk-free annuities in the foreseeable future. *See* Dkt No. 14-2 at 368 (admission of Plan actuary in deposition that she is unaware of plans to terminate in the next ten years). Second, creating such an exception for underfunded plans would effectively swallow the rule, as withdrawal-liability calculations only apply to

underfunded plans in the first place. *See also Sofco*, 15 F.4th at 420–21 (holding that annuity-based settlement rates are inappropriate when "plans are neither going out of business nor required to purchase annuities to cover the departing employer's share of vested benefits"). Third, *GCIU* does not suggest any exception based on a plan's funding status. The Court cannot create an exception that would undermine the clear statutory requirement that the actuarial assumptions used to calculate withdrawal liability reflect the anticipated experience of the plan.

The Plan also devotes substantial space to arguing that PBGC settlement rates reflect "fair market value" principles accepted by actuaries. Dkt. No. 18 at 14–24. The Plan contends that its actuary followed "both the express terms of the statute and U.S. Supreme Court's interpretative directives exactly," *id*. at 16, and it suggests that modern actuarial standards favoring "financial economics and fair value principles," *id*. at 29, should influence this Court's interpretation of ERISA's requirements. But as the Sixth Circuit aptly noted, "ERISA does not yield to the Actuarial Standards of Practice; the standards must succumb to the statutory requirements." *Sofco*, 15 F.4th at 423. The Court must apply the law as interpreted by the Ninth Circuit.

The arbitrator correctly determined that the Plan's interest-rate assumptions failed to reflect the Plan's anticipated experience and therefore violated ERISA § 1393(a)(1).

1

2

**3.3    The arbitrator correctly ordered the Plan to recalculate the City's withdrawal liability using a seven-percent interest-rate assumption.**

The arbitrator correctly ordered the Plan to recalculate the City's withdrawal liability using a 7% interest rate. This rate represents the Plan's own estimate of its anticipated investment returns—the same rate the Plan used when calculating minimum-funding requirements for participating employers. While plans need not use identical interest rates for both calculations, the arbitrator correctly determined that 7% best reflects the Plan's expected experience.

The Court begins by noting—as the Plan repeatedly argues at length, *see, e.g.*, Dkt. No. 18 at 13–20—that multiemployer plans are *not* statutorily required to calculate withdrawal liability using the same interest-rate assumption that they use when calculating participating employers' minimum-funding contributions. *See United Mine Workers*, 39 F.4th 730 at 741–43; *Nat'l Ret. Fund v. Domestic Linen Control Grp.*, No. 23-CV-5955, 2024 WL 3607316 (S.D.N.Y. July 31, 2024) ("[T]he assumptions used to calculate withdrawal liability must be reasonable 'in the aggregate,' whereas 'each' assumption used to calculate minimum funding must be reasonable."); *compare* 29 U.S.C. § 1393(a)(1), *with id.* § 1084(c)(3)(A). Therefore, the mere fact that the Plan used 7% as the projected rate of return on its equity investments when calculating minimum-funding contributions for 2019 and 2020 does not necessarily require the Plan to use the same assumption when calculating withdrawal liability.

The case of *Domestic Linen Control Group*, 2024 WL 3607316, is instructive. There, as here, the pension plan calculated the departing employer's withdrawal

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 13

liability using the PBGC settlement rates. *Id.* at *1. The arbitrator found this interest-rate assumption unreasonable and "ordered [the plan] to recalculate the assessment using the 7.3% interest rate that [the plan] uses for determining [minimum] funding levels." *Id.* The district court affirmed the arbitrator's decision rejecting the plan's calculations but remanded on the question of remedy. *Id.* The court explained: "[T]he arbitrator ordered [the plan] to recalculate liability using the 7.3% rate without ever stating why it was doing so." *Id.* at *7 (citing *Employees' Ret. Plan of Nat'l Educ. Ass'n v. Clark Cnty. Educ. Ass'n*, 664 F. Supp. 3d 24, 45 (D.D.C. 2023) (remanding to arbitrator where arbitrator did not make a specific factual finding about the actuary's best estimate); *New York Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund*, 303 F. Supp. 3d 236, 256 (S.D.N.Y. 2018) (remanding to arbitrator with direction that liability should be recalculated using the 7.5% assumption testified to as the best estimate absent "additional evidence sufficient to support a different rate")). The court noted that while it was "difficult to see how any other rate could be used" given that "the Plan's actuary testified that his best estimate of anticipated returns was 7.3%[,]" nevertheless, "because the arbitrator's basis for using 7.3% is not explained in the award, the Court will remand to the arbitrator for further consideration and to make his reasoning explicit." *Id.* at *8.

This case differs in a crucial respect. Unlike the arbitrator in *Domestic Linen Control Group,* Arbitrator Scogland did state an affirmative factual conclusion that "[t]he investment rate (7%) best reflects the anticipated experience under the plan." *See* Dkt. No. 14-2 at 751. This conclusion was supported by the evidentiary record

before him, including the actuarial reports and deposition transcript quoted above. This factual conclusion, albeit brief and unexplained, is presumed correct absent a preponderance of evidence to the contrary—a burden the Plan has not met. *See* 29 U.S.C. § 1401(c).

Also, unlike in *Domestic Linen Control Group*, this Court has the benefit of circuit-level precedent directly on point. In *GCIU*, the arbitrator ordered the plan's actuary to recalculate the employer's withdrawal liability using a rate of 7%—which the arbitrator derived, as here, from the rate assumed by the plan's actuary when calculating minimum funding. *See GCIU-Emp. Ret. Fund v. MNG Enters., Inc.*, No. CV 21-00061 PA (C.D. Cal. July 8, 2021), Dkt. No. 25-6 at 225 (Arbitration Ruling) ("[The plan actuary] testified for the past several years the funding rate he has used was 7%), 230 ("The withdrawal liability assessments must be recalculated by using a withdrawal liability rate of 7%). Even though the arbitrator provided no analysis for this seven-percent choice (beyond simply stating that it was the rate used for calculating minimum funding), the district court nonetheless affirmed the decision (though modifying the rate from 7% to 8% based on a finding that the 7% rate reflected a typographical error on the part of the arbitrator). *See GCIU-Emp. Ret. Fund v. MNG Enters., Inc.*, No. CV 21-00061 PA (JEMX), 2021 WL 3260079, at *5 (C.D. Cal. July 8, 2021) ("[T]he actuary should have used an 8% interest rate, which was the actuary's 'best estimate' of the Fund's minimum funding rate during the withdrawal years, i.e. the rate they anticipated the plan assets would grow."). The Ninth Circuit affirmed this part of the district court's order. *See GCIU*, 51 F.4th at 1098–1100.

Ninth Circuit precedent thus counsels district courts to affirm MPPAA arbitration decisions ordering pension plans to recalculate withdrawal liability using the interest-rate assumption involved in the plan's minimum-funding calculation even when the arbitration decision offers little to no analysis about why that's the best assumption—at least as long as (1) the actuary is on the record testifying that the minimum-funding interest rate reflects their reasonable estimate of the plan's anticipated experience, and (2) the arbitrator states a conclusion to that effect. If this were not the law of the circuit, the Ninth Circuit in *GCIU*, like the district court in *Domestic Linen Control Group*, would have remanded to the arbitrator for further fact-finding about the appropriate interest-rate assumption. Accordingly, this Court affirms Arbitrator William L. Scogland's decision to order the Plan to recalculate the City's withdrawal liability using a seven-percent interest-rate assumption.

## 3.4    The Court declines to award attorneys' fees.

ERISA authorizes the Court to award attorneys' fees and expenses to the prevailing party in an action to enforce an MPPAA arbitration decision. 29 U.S.C. § 1451(e). The City requests fees "because [the Plan] lacks any legal authority for its position and has caused the City to incur fees disputing arguments that the Ninth Circuit has already resolved." Dkt. No. 19 at 20.

Courts in the Ninth Circuit consider five factors when evaluating fee requests in MPPAA cases: (1) the degree of the opposing party's culpability or good faith; (2) the ability of the opposing party to satisfy an award of fees; (3) whether an award of

fees would deter others; (4) whether the participants and beneficiaries under an ERISA plan would benefit from an award of fees; and (5) the relative merits of the parties' positions. *See Cuyamaca Meats, Inc. v. San Diego & Imperial Ctys. Butchers' & Food Employers' Pension Tr. Fund*, 827 F.2d 491, 500 (9th Cir. 1987).

Applying these factors here yields a close call. As the City rightly points out, the Plan—attempting to wave away on-point, binding authority—raises arguments that the Ninth Circuit has expressly rejected. The Plan devotes pages upon pages of briefing to arguing in favor of actuarial practices that have no bearing on the clear application of statutory law as construed by the Ninth Circuit to the facts here. *See, e.g.*, Dkt. No. 18 at 24 ("We should rely on, and then defer to, the highly skilled, independent and regulated [actuarial] professionals tasked under the law with being experts in their field. Their collective voice is clear - appellate courts have made a clear error in understanding fair value concepts."). Awarding fees would have deterrent value in discouraging such borderline-frivolous arguments in the future.

Yet the body of case law undermining the Plan's arguments is relatively recent, with the key decisions issued only in the past few years. It is reasonable that it should take some time for actuarial "standards [to] succumb to the statutory requirements." *See Sofco*, 15 F.4th at 423. The Court does not find bad faith. The Court also declines to impose a new financial burden on an already-underfunded pension plan whose beneficiaries have played no role in this dispute.

The Court therefore denies the City's request for attorneys' fees and costs under § 1451(e). But the Court warns the Plan and its actuary that as the weight of

precedent accumulates, the judicial calculus around awarding fees and costs to deter meritless arguments will shift accordingly.

### 4.  CONCLUSION

In sum, the Court GRANTS the City's motion for summary judgment, Dkt. No. 17, DENIES the Plan's motion for summary judgment, Dkt. No. 18; DENIES the City's request for attorneys' fees and costs; AFFIRMS the arbitration award of Arbitrator William L. Scogland in *City of Tacoma, Claimant, v. Western Metal Industry Pension Fund, Respondent*, AAA Case No. 01-23-0001-6879; ORDERS the Plan and its actuary to reassess the City's withdrawal liability using an interest-rate assumption of 7% and to give the City credit for payments previously made; and DIRECTS the Clerk of Court to ENTER JUDGMENT closing this case.

Finally, the Court regrets its delay in addressing these matters.

It is so ORDERED.

Dated this 28th day of May, 2025.

Jamal N. Whitehead
United States District Judge

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 18